UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SEARCH WARRANT FOR THE PROPERTY LOCATED AT _____ IRVINE, CALIFORNIA; THE PERSON OF _____; AND DIGITAL DEVICES OWNED, USED OR CONTROLLED BY _____; AND GOVERNMENT'S EX PARTE APPLICATIONS FOR ORDER SEALING SEARCH WARRANT AND SUPPORTING AFFIDAVIT | Case Nos. 8:24-MJ-00123<br>　　　　　　8:24-MJ-00124<br>　　　　　　8:24-MJ-00125<br><br>**MEMORANDUM DECISION REGARDING ISSUANCE OF SEARCH AND SEIZURE WARRANTS AND APPLICATIONS TO SEAL** |

I.　**INTRODUCTION**

On March 14, 2024, the Government requested search warrants for an individual,[1] a residence located in Irvine, California, and digital devices owned, controlled, or used by that individual. The Assistant United States Attorney presented three Applications for a Warrant by Telephone or Other Electronic Means pursuant to

---

[1] The Court does not include the name of the individual or the specific address here to protect the privacy of the individuals affected.

Federal Rule of Criminal Procedure 41(c) and (d)(3) ("Search Applications") and three related Ex Parte Applications for Order Sealing Search Warrant and Supporting Affidavit ("Sealing Applications").  A Special Agent for the Federal Bureau of Investigation and an Assistant United States Attorney were the affiant/declarant of the accompanying affidavits.

After a close review of the Search Applications, the Court must deny all three because the Government fails to establish probable cause.  The Court cannot find that there is a fair probability that evidence, fruits, or instrumentalities of the target offenses will be found in the locations to be searched in Irvine, California.  In this case, the Government has provided no reason to believe evidence of an event that occurred over three years ago in Washington, D.C. would have been transported across the country to the location to be searched.  Similarly, the Government offers only stale evidence from 2021 and 2022 and generalized conclusory statements related to digital devices, which is insufficient to establish probable cause for the search.  The Court also exercises its discretion to deny the Sealing Applications because the Government fails to show a compelling reason for sealing in this specific, and somewhat unusual, circumstance.

## II.    SUMMARY OF SEARCH APPLICATIONS

The Search Applications seek authorization for the FBI to seize evidence, fruits, or instrumentalities of six alleged crimes, all of which are misdemeanors, that occurred on January 6, 2021, in Washington, D.C.[2]  The target is a young woman, who is a resident of Washington, D.C. ("Defendant"), but is currently visiting Irvine, California.

---

[2] Misdemeanor crimes carry a maximum prison term of more than five days but less than one year.  18 U.S.C. § 3559(a)(6)–(8).

The FBI intended to execute the search warrants in Irvine, California at the time it arrests the Defendant based on an Arrest Warrant related to a Criminal Complaint issued by a United States Magistrate Judge in the District of Columbia on February 28, 2024.[3] The Criminal Complaint charges Defendant with the same six misdemeanors described in the Search Applications.[4]

All three Search Applications are supported by an identical Affidavit. The Affidavit states, as summarized by the Court, that it is made for the purpose of obtaining search and seizure warrants for the following:

(1) the apartment located at _____, Irvine, California, 92618 (referred to as the "Premises" in the Search Applications but here as the "Irvine Apartment"), including digital devices found there;

(2) the Person of _____ (described here as Defendant), including any and all personal belongings and digital devices within the Defendant's immediate vicinity and control at the location where the search is to be executed; and

(3) digital devices owned, used, or controlled by the Defendant, including but not limited to an Apple iPhone 14 Plus with phone number XXX-XXX-5223 and IMEI number 355348890977460 (the "Subject Devices"), believed to be on the Defendant's person or located at the Irvine Apartment.

---

[3] 1:24-MJ-00072

[4] After notification that the Search Applications were denied, but prior to the issuance of this Order, the FBI arrested Defendant on March 15, 2024. Defendant made her initial appearance before this Court in the Central District of California. The misdemeanor nature of the charges was confirmed by the Report Commencing Criminal Action prepared and signed by arresting Special Agent and on the record by the appearing Assistant United States Attorney.

The Search Applications' Affidavit sets forth voluminous background information about the events that occurred January 6, 2021, including Defendant's alleged activities, that served as the basis for the Criminal Complaint and Arrest Warrant.  The Court summarizes relevant portions related to the Defendant for background.

The Government subpoenaed Defendant's bank records that contain evidence Defendant traveled to, stayed at a hotel, and ate and shopped in and around the greater Washington, D.C. area when the charged misdemeanors are alleged to have occurred.[5]

In July 2022, the Government obtained a search warrant for the Defendant's Instagram accounts.[6]  This resulted in evidence that the Defendant traveled to Washington, D.C., and the U.S. Capital, when the charged misdemeanors are alleged to have occurred.  It also resulted in evidence that Defendant deleted related Instagram posts shortly thereafter.

The Special Agent summarized and provided surveillance footage and other video evidence that show the Defendant at the U.S. Capitol when the charged misdemeanors are alleged to have occurred.  In fact, the Government has photographic and video evidence which appear to depict the Defendant's presence outside the U.S. Capitol, and the actions of the Defendant, including her presence inside the Capitol building for a total of 2.5 minutes, during which she helped pass a coffee table out of a window.  Based on these actions, the Government charged Defendant with the following misdemeanors: (i) theft of government property and aiding and abetting; (ii) entering or remaining in

---

[5] Defendant is presumed innocent until proven guilty and nothing stated in this order is intended to convey otherwise.

[6] The Government also previously obtained a search warrant of Defendant's then Twitter account, which contained no incriminating evidence.

restricted buildings or grounds; (iii) disorderly and disruptive conduct in a restricted building or grounds; (iv) disorderly and disruptive conduct in the Capitol buildings; and (v) parading, demonstrating, or picketing in a Capitol building.  See 18 U.S.C. §§ 641, 2; id. §§ 1752(a)(1), (2); 40 U.S.C. §§ 5104(e)(2)(D), (G).

The Special Agent summarized law enforcement interviews with Defendant and her mother from 2021 regarding the events of January 6, 2021.  The Affidavit summarized the Special Agent's interview in December 2023 with employees of Defendant's apartment building in Washington, D.C.  To confirm her identity, the Special Agent showed these employees Defendant's driver's license photo, a photo from Defendant's Instagram account, as well as six photographs of Defendant at the U.S. Capital.

## III.   LEGAL STANDARD FOR SEARCH WARRANTS

The Fourth Amendment of the United States Constitution recognizes that the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures shall not be violated.  To effectuate that protection, the Fourth Amendment requires that warrants be issued only upon a showing of probable cause.  Probable cause for a search requires a judicial finding that "there is a 'fair probability that contraband or evidence of a crime will be found in a particular place,' based on the totality of circumstances."  Dawson v. City of Seattle, 435 F.3d 1054, 1062 (9th Cir.2006) (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)).

An affidavit from a federal law enforcement officer must provide the magistrate judge with a substantial basis for determining the existence of probable cause.  "Probable cause means more than bare suspicion but less than absolute certainty that a search will be fruitful."  Mason v. Godinez, 47 F.3d 852, 855 (7th Cir. 1995) (citations

1  omitted).  However, wholly conclusory statements, such as "cause to suspect" or "I

2  believe that," fail to meet this requirement.  See Gates, 462 U.S. at 239.

3      Similarly, information offered to support a search warrant application must not

4  be so old as to make its reliability suspect.  To avoid staleness, "[t]he facts must show

5  that the property to be seized was known to be at the place to be searched so recently as

6  to justify the belief that the property is still there at the time of the issuance of the search

7  warrant."  Durham v. United States, 403 F.2d 190, 194 (9th Cir.1968).  Information

8  offered to support a search warrant application becomes stale when enough time has

9  elapsed such that there is no longer a sufficient basis to believe that the items to be

10  seized are still on the premises.  United States v. Lacy, 119 F.3d 742, 746 (9th Cir. 1997)

11  (quoting United States v. Gann, 732 F.2d 714, 722 (9th Cir. 1984)); see also United

12  States v. Grant, 682 F.3d 827, 835 (9th Cir. 2012) (reasoning that a nine-month gap

13  between homicide and search of house for suspected murder weapon was a "significant

14  gap in time" that diminished the probability the evidence sought at house was still

15  there).  "The most convincing proof that the property [that is the object of the search]

16  was in the possession of the person or upon the premises at some remote time in the

17  past will not justify a present invasion of privacy."  Durham, 403 F.2d at 193.

18  **IV.**  **LEGAL ANALYSIS**

19      The Court finds the Government fails to establish probable cause justifying any of

20  the three search warrants it requests because there is no reason to believe evidence will

21  be found in Irvine, California.  The relevant information in the Affidavit is almost all

22  from 2021 and 2022, which is either seriously stale or is irrelevant to the search and

23  seizure of the locations and items requested in the Search Applications.  The

24  Government provides no factual basis for the Court to find that there is a fair probability

that evidence of the crimes that occurred over three years ago in Washington, D.C. will be found at another person's residence that Defendant is currently visiting in Irvine, California.  The Government simply provides no information that justifies the invasion of privacy of the person that currently resides at the Irvine Apartment, and who appears to be wholly uninvolved in the misdemeanor charges.  Similarly, the Government provides no reason for the Court to find that Defendant would have brought evidence of the crimes occurring three years ago on her person or in her bags on a trip to Irvine.

## A.    <u>SEARCH OF DEFENDANT'S PERSON AND BELONGINGS</u>[7]

The Search Application for Defendant's person and belongings fails to provide sufficient facts to find probable cause.  The Search Application seeks to search the person of the Defendant and "any and all clothing, personal belongings, digital devices, backpacks, wallets, briefcases, purses and bags" within Defendant's immediate vicinity and control, at the location where the search warrant is executed.  The Special Agent believed the search would occur at the Irvine Apartment, which is the long-time residence of a third party.  Therefore, the belongings and digital devices of someone other than the Defendant are also subject to the requested search.  The Government delineates 26 broad categories of items to be seized during the search, including evidence of and materials used to commit the charged misdemeanors, evidence

---

[7] 8:24-MJ-00124

regarding the underlying events at issue, as well as any digital devices containing evidence.[8]

In order to obtain this search warrant, the Affidavit provides the following information, only the most relevant of which is summarized here.  The Government describes a series of events that occurred on January 6, 2021, and Defendant's alleged participation in it.  The Government offers a summary of bank records, travel records, social media communications and posts, and surveillance video from early 2021, which reflect the Defendant's actions in early 2021.  This information includes evidence Defendant used a cell phone to communicate on January 6, 2021, including by social media.  Evidence from social media reflects that, in early 2021, Defendant deleted posts related to the events at issue.  However, the Government admits that Defendant is no longer using the same cell phone, having obtained two new cell phones in the past three years.  Elsewhere in the Affidavit, the Government describes that Defendant currently resides in an apartment in Washington, D.C., she recently traveled to Irvine, California and she has future travel booked for a day trip to Phoenix, Arizona from Southern California.

The Government fails to provide facts from which the Court can find there is a fair probability that evidence or instrumentalities of the charged misdemeanors will be found in "any and all clothing, personal belongings . . . , backpacks, wallets, briefcases, purses and bags" that are within Defendant's immediate vicinity and control in Irvine,

---

[8] The Government seeks authority to search and seize digital devices in all three requested search warrants.  While perhaps intended to cover only Defendant's devices, as drafted, the requested search warrants include devices owned by others, including the Irvine resident, as described in more detail below.

California.[9]  The facts provided to the Court merely suggest that Defendant is visiting the area.  There are no facts presented from which to find there is a fair probability that evidence of the three-year-old misdemeanors would be transported across the country on Defendant's person, in a purse, luggage, or a backpack.

Here, the charged crimes are related to Defendant's presence at the U.S. Capitol on January 6, 2021.  The Government's generalized statement that people keep evidence with them or in their homes, including clothing worn during the crime, is irrelevant and insufficient here.  Bare hope and suspicion that a Defendant might have evidence on her three years later, while across the country visiting someone who appears entirely unconnected to the alleged crimes, does not amount to probable cause sufficient to justify an invasion of Defendant's person and belongings.  See Durham, 403 F.2d at 193.

The Government requests to search any belongings in the Defendant's vicinity and control, even if they are in fact not her belongings.  Because this search is intended to occur at the Irvine Apartment, "any and all clothing, personal belongings, digital devices, backpacks, wallets, briefcases, purses and bags" is sure to include items owned by the Irvine Resident (defined below), rather than Defendant.  The language "in the vicinity and control" of the Defendant does not limit the scope of the search in any true sense.  If Defendant is near the Irvine Resident's backpack, briefcase, cell phone, or computer, it would be subject to search.  Any room, closet, drawer, or space Defendant is in or has access to at the Irvine Apartment would be subject to search.  This Search Application is fatally overbroad.  See Matter of Residence in Oakland, California, 354 F. Supp. 3d 1010, 1014 (N.D. Cal. 2019) (denying application for search warrant that

---

[9] Digital devices will be addressed separately below.

sought to seize all digital devices at subject premises, regardless if they belonged to suspects, because the "Government cannot be permitted to search and seize a mobile phone or other device that is on a non-suspect's person simply because they are present during an otherwise lawful search").

The Government fails to present facts from which the Court can find a fair probability that evidence or instrumentalities of the charged misdemeanors are likely to be found at the place or in the items to be searched.  Thus, the Court finds the Search Application for Defendant and her belongings does not demonstrate that probable cause exists and is, therefore, denied.

**B.    SEARCH OF THE IRVINE APARTMENT[10]**

The Search Application for the Irvine Apartment lacks any facts whatsoever to find probable cause exists.  Specifically, the Government seeks a search warrant for the Irvine Apartment where an identified individual, who is not the Defendant and not otherwise mentioned in the Search Application, has resided for the last several years (the "Irvine Resident").  Defendant appears to be currently visiting the Irvine Resident. Defendant has been spotted at the Irvine Apartment by law enforcement twice on March 12, 2024, and other evidence reflects she is in the Irvine area.  Based on the Defendant's recent visit, the Government wants to search the Irvine Apartment and electronic devices found therein to determine if they contain any of the 26 categories of items to be seized and for Internet activity, browser history, book marked or favorite web pages, and internet search terms, among other things.  The Government seeks to seize 26 broad categories of items including: (1) communications, photos and video related to the

---

[10] 8:24-MJ-00123

charged misdemeanors; (2) evidence of a conspiracy to commit the charged misdemeanors; (3) evidence of efforts to conceal or delete evidence of the charged misdemeanors or to flee prosecution; (4) evidence of materials that were used to commit the charged misdemeanors; (5) evidence that the Defendant committed additional crimes; and (6) digital devices containing evidence of the commission of the misdemeanors by Defendant "and other identified and unidentified persons."

　　　　To obtain this search warrant, the Affidavit provides the following information. The FBI previously obtained a search warrant for historical and prospective cell site location on the Defendant's cell phone. According to the Special Agent, this historical and prospective cell site data confirms that the Defendant currently resides in Washington, D.C., and was in Irvine, California for two days in early February 2024, again on February 16, 2024, and she has remained in the area. The FBI learned Defendant's specific flight details for the trips to Irvine from American Airlines. That airline does not have a return flight reservation for Defendant. The FBI also learned from American Airlines that the Irvine Resident booked travel with the Defendant from John Wayne Airport to Phoenix, Arizona, for a one-day return trip on April 13, 2024. In addition, Defendant's cell site location information from March 6, 2024, suggests she traveled to a Target store within a couple of miles of the Irvine Apartment, which has been confirmed by surveillance footage from the Target store. Defendant visited the same Target store again on March 12, 2024. Law enforcement agents observed her at the Urth Café in Laguna Beach and the Irvine Apartment that same day. The Government asserts that, based on this evidence, "there is probable cause to believe [Defendant] is staying at the [Irvine Apartment]."

1    But the Government has not established probable cause to search the Irvine

2  Resident's apartment, i.e., the Irvine Apartment. The Government provides no facts to

3  support a finding that there is a fair probability that contraband or evidence of the

4  charged misdemeanors will be found at the Irvine Apartment. Dawson, 435 F.3d at

5  1062. The Government's facts about the Irvine Resident, in their entirety, are that he

6  booked a flight to Arizona in April, he has resided at the Irvine Apartment for several

7  years, and law enforcement saw him outside the door of the apartment on March 10,

8  2024. All the Affidavit demonstrates is that the Irvine Apartment is the long-time

9  residence of an individual that seems to have nothing to do with the charged

10  misdemeanors or the underlying investigation. Nowhere does the Affidavit tell the

11  Court why there is a fair probability that evidence of the misdemeanors Defendant is

12  charged with will be found at this Irvine Resident's apartment. The Defendant

13  remaining in Irvine since mid-February with plans for a day trip to Arizona in a month's

14  time with the Irvine Resident does not fill the Government's factual gap.

15    The facts provided are insufficient for the Court to find there is a fair probability

16  that evidence of the charged misdemeanors will be found at the Irvine apartment. The

17  misdemeanors charged occurred over three years ago, on one day, on the other side of

18  the country. Defendant's brief presence at the Irvine Apartment, with nothing more,

19  does not justify a government intrusion into the privacy of the Irvine Resident of this

20  magnitude. See Silverman v. United States, 365 U.S. 505, 511 (1961) ("The Fourth

21  Amendment, and the personal rights which it secures, have a long history. At the very

22  core stands the right of a man to retreat into his own home and there be free from

23  unreasonable governmental intrusion.").

24

## C. **SEARCH AND SEIZURE OF DIGITAL DEVICES**[11]

Finally, the Government filed a stand-alone Search Application which seeks a search warrant for "[d]igital devices owned, used, or controlled by [Defendant], including but not limited to an Apple iPhone 14 Plus with the phone number xxx-xxx-5223 and IMEI [International Mobile Equipment Identity] number 355348890977460" (described in the Search Applications collectively as the "Subject Devices"), which the Government believes to be on Defendant or located at the Irvine Apartment.  This is in addition to the Search Application for Defendant's person, which included a search of digital devices in her "vicinity and control," and the Search Application for the Irvine Apartment, which included digital devices "which contain records or evidence of the commission of the" target offenses.[12]  The Government seeks to seize the same broad 26 categories of items and information (described generally here for readability), which it asserts is evidence of the charged misdemeanors including, but not limited to, evidence of Defendant's political beliefs, the times the digital device was used, Internet activity, browser history, "bookmarked" or "favorite" web pages, and Internet searches.

In order to obtain this search warrant, the Affidavit provides the following factual information related to Defendant and her cell phone, as summarized by the Court.  The FBI's investigation indicates the Defendant used a cell phone to record and take pictures during the perpetration of the misdemeanors in 2021.  The Defendant used Instagram and Twitter to post and communicate with others about the event and traveling there.

---

[11] 8:24-MJ-00125

[12] In order for the Government to determine if a digital device contains evidence, the Government must first search the digital device.

1    At the time of and locations near the events at issue in 2021, Defendant had and used a

2    cell phone with the number xxx-xxx-5834 (the "5834 number") and IMEI number

3    352856110067440 ("Phone 1").  The T-Mobile account associated with the 5834 number

4    was terminated on February 8, 2021.

5         Beginning in February 2021, Defendant's cell phone number was xxx-xxx-5223

6    (the "5223 number") and, up until October 2023, she used an iPhone 13 Pro Max with

7    IMEI number 356796487499660 ("Phone 2").  A search warrant to Twitter in June

8    2022 resulted in information reflecting that Defendant's Twitter account is connected to

9    the 5223 number.  Defendant's Instagram account is also connected to the 5223

10   number.  Defendant's application to move into her current apartment in Washington,

11   D.C. also lists the 5223 number.  Since October 2023, the 5223 number has been used

12   by an Apple iPhone 14 Plus with IMEI number 355348890977460 ("Phone 3").  Because

13   Defendant is believed to be staying at the Irvine Apartment, the Government asserts

14   that it has probable cause to believe that the Subject Devices—digital devices owned,

15   used, or controlled by Defendant, including but not limited to Phone 3—are currently

16   located there.

17        The Government provides insufficient facts for the Court to find that there is a

18   fair probability that evidence of the misdemeanors will be found in the Subject Devices

19   located on Defendant or at the Irvine Apartment.  First, the Government's evidence is

20   impermissibly stale and tenuous.  Probable cause must exist at the time law

21   enforcement applies for a warrant.  United States v. Griffith, 867 F.3d 1265, 1274 (D.C.

22   Cir. 2017).  More than three years have passed since the alleged crimes occurred and

23   Defendant is no longer using the same phone.  In fact, she is now on her second new

24   phone.  The Government's factual showing specific to Defendant relates only to Phone 1.

Yet there is no evidence to suggest that Phone 1 still exists or is in Defendant's possession in California.  The same is true for Phone 2.  Indeed, there is no reason to believe Defendant is keeping three phones on her person.  The likelihood that incriminating evidence continues to exist in the place to be searched—taking into account "the opportunities those involved in the crime would have had to remove or destroy [incriminating] items"—is an important consideration when assessing the existence of probable cause.  United States v. Griffith, 867 F.3d 1265, 1275 (D.C. Cir. 2017).  The staleness of the Government's evidence provides significant reason to question its reliability as a basis for searching all of Defendant's digital devices, much less those located in Irvine, California now.  There must be a nexus between the item to be seized and the criminal behavior.  United States v. Griffith, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (citing Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307 (1967)).

Second, the Government also asserts generalized facts that say nothing about Defendant's conduct and do not provide a basis for the Court to find probable cause exists to search all of her devices.  For example, the Affidavit states that virtually all adults in the United States use mobile digital devices; that 97% of Americans own at least one cell phone and 85% of Americans use at least one smartphone; that cell phones are expensive and people routinely retain their cell phones for months or years; that it is common for individuals to back up their data across multiple devices; and that Apple has a seamless sync service.  Further, the Affidavit states that people use their cell phones to prepare for or arrange crimes, to coordinate travel to and from the location of crimes, cell phones can identify the location of the user, and they contain communications between co-conspirators or evidence of motive or intent.

Although some of these things may be true, that is not the point. These generalized statements are too tenuous and not specific to the Defendant's alleged crimes or conduct in order to support a finding of probable cause here. <u>United States v. Weber</u>, 923 F.2d 1338, 1345 (9th Cir. 1990) (generalized statements regarding groups of people and boilerplate assertions do not support probable cause when probable cause would depend on too many inferences where each inference alone may be reasonable but, "with each succeeding inference, the last reached is less and less likely to be true"). The Government fails to provide a sufficient factual basis for the Court to believe Phone 3 contains evidence of the misdemeanors. <u>See</u> <u>United States v. Underwood</u>, 725 F.3d 1076, 1084 (9th Cir. 2013) (affirming that warrant was not based on probable cause because it lacked sufficient factual basis to tie defendant to crimes, but was instead dependent on "too many inferences"); <u>United States v. Lofstead</u>, 574 F. Supp. 3d 831, 841 (D. Nev. 2021) (finding there was no probable cause for search of cell phone due to over reliance on inferences rather than facts).

Besides the Governments generalizations, there are no facts to establish a fair probability exists that Phone 3 has evidence of the charged misdemeanors that occurred in 2021. The Government asks the Court to infer that evidence from Phone 1 was transferred to Phone 2 and then to Phone 3, because some service providers have this ability and many people do it. However, The Government proffers no facts to show that Phone 1, used on the day of the alleged crimes, was an iPhone or even an Apple product. There is no reason for this Court to find that data potentially from another format of phone was transferrable or in fact transferred to Phone 2 and then again to Phone 3, which are both Apple products.

Moreover, the Government's general assertion that virtually everyone in the United States has a smartphone does not establish the required nexus between the item to be seized here and the alleged criminal behavior.  Warden, Md. Penitentiary v. Hayden, 387 U.S. 294, 307, (1967); United States v. Griffith, 867 F.3d 1265, 1278 (D.C. Cir. 2017) (concluding government's generalized statements that everyone owns a cell phone failed to demonstrate probable cause to search for and seize a cell phone from a home, in part, because no indication the phone would retain any incriminating information about crime occurring one year prior).  The D.C. Circuit rejected this impermissible theory for probable cause in Griffith:

> [T]he government's argument in favor of probable cause essentially falls back on our accepting the following proposition: because nearly everyone now carries a cell phone, and because a phone frequently contains all sorts of information about the owner's daily activities, a person's suspected involvement in a crime ordinarily justifies searching her home for any cell phones, regardless of whether there is any indication that she in fact owns one. Finding the existence of probable cause in this case, therefore, would verge on authorizing a search of a person's home almost anytime there is probable cause to suspect her of a crime. We cannot accept that proposition.
>
> We treat the home as the "first among equals" when it comes to the Fourth Amendment. The general pervasiveness of cell phones affords an inadequate basis for eroding that core protection.

United States v. Griffith, 867 F.3d 1265, 1275 (D.C. Cir. 2017) (internal citations omitted).  Today, a cell phone deserves similar protections as it contains the same, if not more, private information about a person's daily activities than the home.  "Indeed, a cell phone search would typically expose to the government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is." Riley v. California, 573 U.S. 373, 396–97 (2014).

In addition, the D.C. Circuit in <u>Griffith</u> recognized that a year gap between the commission of a crime and the request for a search warrant weighs against justifying a search due to the limited likelihood that any cell phone discovered would still contain evidence of the crime.  <u>See</u> 867 F.3d at 1275; <u>see</u> <u>also</u> <u>United States v. Grant</u>, 682 F.3d 827, 835 (9th Cir. 2012) (reasoning that a nine-month gap between homicide and search of house for suspected murder weapon was a "significant gap in time" that diminished the probability the evidence sought at house was still there).

A more than three-year gap, a different telephone number, two new phones, and travel across the country make it unlikely that the Subject Devices in Defendant's current possession or at the Irvine Apartment will contain evidence of the crimes.  The Search Application for Digital Devices is denied.

## V.   **APPLICATIONS TO SEAL**

The government filed <u>Ex</u> <u>Parte</u> Applications (the "Sealing Applications") seeking an order sealing the search warrant, the application for the search warrant, and all affidavits and attachments thereto (the "Warrant Materials") for each of the Search Applications.  Assistant United States Attorney, Caitlin J. Campbell, filed a declaration in support of the Sealing Applications ("Campbell Decl.").  The government provides two reasons for sealing the Warrant Materials.  First, the government states that "[t]he likelihood of discovering the items sought in the search warrant may be jeopardized if the affidavit in support of the search warrant in this case were made publicly available before the warrant is executed."  (Campbell Decl. ¶ 2.)  Second, the government states: "The affidavit in support of the search warrant describes law enforcement investigation techniques that may jeopardize ongoing investigations if the affidavit were to be disclosed.  Specifically, the affidavit describes recent surveillance on the target to

confirm her location, among other things." (Campbell Decl. ¶ 3.) These reasons are insufficient to seal the Warrant Materials.

District courts have discretion to seal search warrant materials if the party seeking to seal articulates compelling reasons "that outweigh the general history of access and the public policies favoring disclosure." United States v. Bus. of Custer Battlefield Museum & Store Located at Interstate 90, Exit 514, S. of Billings, Mont. ("Battlefield Museum"), 658 F.3d 1188, 1195 (9th Cir. 2011) (citing Kamakana v. City & County of Honolulu, 447 F.3d 1172, 1178–79 (9th Cir. 2006); see also LAURIE L. LEVENSON, FEDERAL CRIMINAL RULES HANDBOOK, Rule 41(e) at 699 n.64 (2024 ed.) ("The court has discretion to seal an affidavit in support of a search or arrest warrant if the government demonstrates potential adverse consequences to persons or an investigation by the granting of immediate access." (citing Matter of EyeCare Physicians of America, 100 F.3d 514, 518 (7th Cir. 1996))).  The court must balance the competing interests of the public and the party who seeks to keep certain judicial records secret. See Battlefield Museum, 658 F.3d at 1195.  "[I]f the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." Id. (quoting Kamakana, 447 F.3d at 1179).

The Sealing Applications fail to articulate compelling reasons to seal.  The Government is concerned that Defendant may destroy evidence if she discovers the warrants prior to their execution, and that ongoing investigations may be jeopardized if she learns that the government is monitoring her location.  But these conclusory statements are not compelling reasons in this specific case.  The search warrants are not going to be served because they have been denied for lack of probable cause.  Also, the

government has already charged Defendant in a Criminal Complaint with the six at-issue misdemeanors.  In addition, prior to the issuance of this decision, the government arrested Defendant and the Criminal Complaint was unsealed, which further suggests that destruction of evidence or any secrecy in monitoring her location are stale and uncompelling concerns here.  Moreover, the language "among other things" when tied to monitoring Defendant's location is not a useful or specific factual statement that can support compelling need.  See Kamakana, 447 F.3d at 1178–79.

Conversely, there is a strong presumption of public access to judicial records that "is justified by the interest of citizens in 'keep[ing] a watchful eye on the workings of public agencies.'"  Kamakana, 447 F.3d at 1178 (quoting Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597—98 (1978)).  The right of public access ensures that courts have a measure of accountability, allows public monitoring, and furthers the public interest in understanding the judicial process and government activities.  See id.; see also Battlefield Museum, 658 F.3d at 1194–95 (explaining warrant materials are often used to adjudicate important constitutional rights and access is important to public's interest in understanding "the criminal justice system and may operate as a curb on prosecutorial or judicial misconduct" (citations omitted)); In re Application of New York Times Co. for Access to Certain Sealed Ct. Recs., 585 F. Supp. 2d 83, 93 (D.D.C. 2008) (right of access favored disclosure of warrant materials because citizens have "legitimate interest in observing and understanding" how government's investigation progressed).  Although access to judicial records is not absolute, Kamakana, 447 F.3d at 1178, the Ninth Circuit has held that the common law right of access does not apply to warrant materials "during the pre-indictment stage of an ongoing criminal investigation." Times Mirror Co. v. United States, 873 F.2d 1210, 1221 (9th Cir. 1989)).  Times Mirror,

however, is not controlling here.  The Government has already charged and arrested Defendant on the same charges listed in the Search Applications.

Because the Government has not articulated a compelling reason for sealing, the Court cannot "articulate the factual basis" to seal the Warrant Materials "without relying on hypothesis or conjecture."  <u>Battlefield Museum</u>, 658 F.3d at 1195.  For the foregoing reasons, the Sealing Applications are DENIED.

**VI.    <u>CONCLUSION</u>**

For all of the reasons stated above, the Search Applications and Seal Applications are denied.

IT IS SO ORDERED.


Dated:  3/27/2024

                                          <u>   /s/ Autumn D. Spaeth      </u>
                                            THE HONORABLE AUTUMN D. SPAETH
                                            United States Magistrate Judge